**DECLARATION OF Helen Strom**

I, Helen Strom, declare as follows:

1. I am a resident of the State of New York. I am over the age of 18 and have personal knowledge of all the facts stated in this declaration, except to those matters stated on information and belief, which I believe to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Benefits and Homeless Advocacy Unit Director at the Safety Net Project ("SNP"), an independent project of the Urban Justice Center, a nonprofit 501(c)(3) organization incorporated in the State of New York. I have worked at the Safety Net Project since 2011. As Unit Director my responsibilities include supervising our benefits and homeless advocacy work, including supervising staff who maintain relationships and coordinate legal clinics with community partners, and staff who work directly with community members in need of benefits advocacy assistance. SNP provides free legal services to low and no-income households at legal clinics located at food pantries, soup kitchens, and community health centers throughout New York City. I also manage community organizing that is designed to help directly-impacted New Yorkers collectively advocate for their rights to benefits and permanent housing. We advise, assist, and represent New York City's most vulnerable members who have questions about, or issues with, public benefits programs, including Public Assistance, SNAP, and Medicaid, as well as provide a range of housing and homelessness legal services.

3. SNP has been actively involved in litigation regarding SNAP benefits in the past. In 2008, we settled the federal lawsuit *Williston v. Eggleston* with New York City's Human Resources Administration (HRA) and New York State's Office of Temporary and Disability Assistance (OTDA), which addressed a systematic breakdown in the processing of

SNAP (Food Stamp) applications. We continue to monitor SNAP issues to this day so that everyday New Yorkers have access to healthy, nutritious food.

4. The Safety Net Project's Benefits and Homeless Advocacy Unit provides free legal services to low and no-income households at legal clinics located at St. John's Bread & Life, the Westside Campaign Against Hunger, the River Fund, and the New York Common Pantry. We advise, assist, and represent individuals who have questions about or issues with the Human Resource Administration's (HRA) public benefits programs. We seek to resolve all Public Assistance, Supplemental Nutrition Assistance Program (SNAP), and other HRA issues through direct advocacy with HRA, but also represent clients when necessary at Administrative Fair Hearings. We also provide technical guidance and support to staff at our clinic sites on issues relating to SNAP and Public Assistance.

5. We additionally conduct policy work in coordination and partnership with the Safety Net Activists, a volunteer group of community members with personal experience with poverty, homelessness, and the public benefits system. We have authored a number of reports regarding critical issues and needed improvements in the administration of New York City's public benefits system, including *Failing Phones: City Infoline Leaves New Yorkers in Need Without Help* and *The Bureaucracy of Benefits: Struggling to Access Public Assistance and SNAP in New York City*. These reports were based on surveys and focus groups conducted with hundreds of benefits recipients and provided extensive recommendations for systemic improvement. Unfortunately, many of the key issues identified in these reports remain unresolved.

6. Since the beginning of 2024, SNP has assisted 626 households who are experiencing problems with their SNAP and Public Assistance benefits, including

discontinuances, denials, reductions, and inadequacies of their SNAP benefits. The vast majority of Public Assistance cases we work on have SNAP components. Since the beginning of 2024, we successfully obtained $459,511.20 worth of SNAP benefits for clients we serve.

7. We have 4.5 staff members who are exclusively dedicated to working on our clients' and members' public benefits and SNAP issues.

8. We are aware that the defendant intends to terminate the waiver of the work requirements for Able Bodied Adults without Dependents ("ABAWD") on November 1, 2025, ahead of its original termination date of February 28, 2026.

9. Should the early termination take effect, a large number of former and current clients will contact us to navigate the rule changes to the ABAWD work requirements. We are already scrambling to generate Know Your Rights materials to help our clients and the public at large, and people are already contacting us about this issue seeking guidance. Unfortunately, because there is currently very little information available regarding the new requirements, we are limited in our ability to guide them towards compliance.

10. In the face of a vast increase in demand for our services, we will have to deploy additional resources to deal with ABAWD-related inquiries and requests for support, which means, inevitably, we will have to turn away people who we would otherwise serve in connection with other SNAP and benefits-related issues.

11. If HRA is forced to roll out the new ABAWD screening system on November 2, 2025, instead of February 28, 2026, there is a very real risk of widespread erroneous deprivation of SNAP benefits. Based on our many years of experience working on HRA agency issues, we anticipate that our clients will encounter chaos as they seek to navigate a rushed and poorly implemented screening system. It is our understanding that the City has not publicized an actual

policy that will govern the new work requirements screening. In light of this, it is inevitable that we will be deluged with requests for assistance, and that many New Yorkers who would otherwise qualify for SNAP benefits will not receive their benefits. Because to date the City has provided no guidance on how ABAWDs can prove compliance with the work requirements, we fear that even people who are complying run the risk of being deprived of SNAP benefits they would be entitled to.

      12.      Our understanding based on the information provided in HRA's proposals, is that HRA is sending or has sent out notices to existing SNAP participants identified as ABAWD. We have not seen the notices or the plan for distribution; however, based on our experience, clients frequently do not receive important notices from HRA due to mail delivery issues, incorrect addresses, and other errors. Furthermore, clients often do not understand the notices that they receive from HRA. HRA notice language is often highly technical and confusing for the average reader. We also frequently see cases where the notice is not sent in the correct language, or the client has disabilities that make it difficult for them to understand the notice. The fact that this is an entirely new system and requirement for recipients of these notices will only exacerbate the likelihood of confusion and non-comprehension.

      13.      HRA has also advised SNAP recipients to call the SNAP On-Demand number regarding the ABAWD program. This is the same phone number that is used for SNAP phone interviews required for applications and recertifications. Clients often inform us that they have significant difficulty getting through at that phone number, with some clients waiting on hold for hours and others reporting to us that their call has been dropped or hung up on. In fact, we conducted research and wrote a report demonstrating the extent of phone-line dysfunction at HRA, as cited to in paragraph 5 herein. For that reason, we are extremely concerned that SNAP recipients will be unable to get the assistance they need, both to comprehend the new requirements and to achieve compliance.

      14.      HRA has also indicated that they are sending existing ABAWDS appointment

notices for HRA PACE vendor for appointments between November 3-26, 2025. Since the vast majority of SNAP recipients have never engaged with ABAWD work requirements due to New York's waivers, we anticipate that many recipients will be confused and unsure about what these appointments are and why they are needed. We frequently get questions from current and former clients about the meaning and consequences of various HRA appointment notices, and we anticipate that this rushed roll-out will cause mass confusion and chaos.

15. Finally, we are extremely concerned about HRA's ability to process the information and documentation submitted by the tens of thousands of SNAP participants identified as ABAWD. HRA is routinely unable to timely process documents that our clients submit as part of their applications and recertifications, resulting in the wrongful discontinuances or denials of their benefits. Given the agency's inability to process current document submissions in a timely manner, we are extremely concerned about their ability to rapidly process a new deluge of documentation.

16. As noted above, we also work with various food pantries and community-based organizations. Should the early termination take effect, in addition to being called on to provide guidance and advocacy to our members and clients, we will also need to field questions and accept more referrals from our partners in the community, beyond the capacity of what we normally accept at our regular community clinics. And we will be called on to do additional Know Your Rights events and trainings, likely beyond our current capacity.

17. We will also need to increase our advocacy with government actors to try to push them to improve their implementation of the new work requirements. Our organizing component, which encompasses areas beyond SNAP, will be diverted to this emergency situation, thus reducing our available resources for other critical organizing priorities, such as increasing statewide cash assistance, expanding access to housing subsidies, and addressing harmful homelessness policies.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed: October 27, 2025.

                                                                                                    Helen Strom