UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| URBAN JUSTICE CENTER-SAFETY NET PROJECT, and LAETICIA MIGUEL, individually and on behalf of all persons similarly situated,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture (USDA),<br><br>　　　　　　　　　Defendants. | **Civ.** |

**DECLARATION OF MOLLY PARK
IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER**

1

I, MOLLY PARK, pursuant to 28 U.S.C. Section 1746, declare under penalty of perjury as follows:

1. I am the Commissioner of the New York City Department of Social Services ("DSS"), overseeing the Human Resources Administration ("HRA") and the Department of Homeless Services ("DHS"). I respectfully submit this Declaration in support of Plaintiffs' Motion for a Temporary Restraining Order in the above-captioned action. I make this declaration in my capacity as Commissioner in consultation with my staff. I am familiar with the matters set forth herein, based on my personal knowledge and observations, conversations with DSS staff, and review of documents provided to me.

2. In 2023, I was appointed Commissioner of DSS. Prior to my appointment as Commissioner, I was First Deputy Commissioner for DHS from 2019 to 2023. Before joining DHS, I was the Deputy Commissioner for Development at the Department of Housing Preservation and Development ("HPD") from 2016 to 2019. Before that role, I served as the Chief Operating Officer of Settlement Housing Fund. From 2010 to 2014, I also served as HPD's Deputy Commissioner of Budget, Fiscal, and Performance Management, following a variety of other roles in the HPD Budget division. I am a graduate of Amherst College and hold a Master's in Public Policy from the University of California-Berkeley Goldman School of Public Policy.

3. DSS is the largest local social services agency in the country. The agency is dedicated to fighting poverty and income inequality and does so by assisting over three million New Yorkers annually through the administration of more than twelve major public social services programs, including the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamps program.

4. HRA administers SNAP benefits within New York City under the oversight of the New York State Office of Temporary and Disability Assistance ("NYS OTDA").

5. Pursuant to 7 U.S.C. § 2015(o) and 7 C.F.R. § 273.24, able-bodied adults without dependents ("ABAWDs") may only receive three months of SNAP benefits within a 36-month period, unless they fulfill the work requirement of 80 hours per month of qualified work or work-related activities ("work requirement"), or by working in workfare or community service assignments. Required participation hours for workfare are equal to the household's monthly benefit amount divided by minimum wage.

6. NYC assessed whether each applicant or recipient was considered an ABAWD or qualified for any permissible exceptions either at their most recent application or last recertification. Based on this assessment, there are approximately 100,000 SNAP recipients currently identified as ABAWDs in New York City. DSS estimates that due to the changes in law described further below, there are approximately 130,000 additional SNAP recipients who are currently exempt but may be identified as ABAWDs under the new rules.

7. If an ABAWD does not qualify for a waiver of or an exception to the work requirement, then the ABAWD receives a "strike" if they fail to comply with the work requirement. A strike causes an ABAWD to accrue a "countable month" of noncompliance. If an ABAWD fails to meet the work requirement three times in a 36-month period, thus reaching three "countable months," then they become ineligible for the remainder of the 36-month period, unless they take steps to regain their eligibility ("the ABAWD time limit").

8. In October 2024, much of New York State, including all of New York City, received a one-year waiver of the ABAWD time limit from United States Department of Agriculture. The waiver was based on a lack of sufficient number of jobs to provide

employment in the area, which was an available criterion for granting a waiver at the time and had been the basis for New York City's ABAWD time limit waivers for many years. The waiver is was set to expire on February 28, 2026.

9. On July 4, 2025, President Donald J. Trump signed into law "H.R.1". H.R.1 changed the exemptions from SNAP work requirements for ABAWDs, limiting the available exemptions. It removed exemptions for adults younger than 65, those responsible to care for children over 14 years of age, homeless individuals, veterans, youth aging out of foster care, and other categories. The law also established new exceptions for "an Indian", "Urban Indian" and "California Indian" as defined in the Indian Health Care Improvement Act.

10. H.R.1 also removed the ability of a state to request a waiver of the ABAWD time limit based on demonstrating a lack of "sufficient number of jobs to provide employment for the individuals" in the area. Under H.R.1, states other than Alaska and Hawaii may only request waivers when the unemployment rate meets or exceeds 10 percent in an area.

11. On October 3, 2025, the United States Department of Agriculture Food and Nutrition Service ("FNS") published an "Implementation Memorandum" providing guidance to states regarding the changes made in H.R.1 to the ABAWD time limit waivers. In the memorandum, FNS stated that it would terminate any waivers of the ABAWD time limit based on the "outdated 'lack of sufficient jobs criteria'" within "30 days after issuance of this memorandum." Accordingly, the memorandum purports to move termination of the waiver of the ABAWD time limit in New York City from February 28, 2026, up four months to November 2, 2025.

12. The sudden waiver termination date is causing and will continue to cause daily administrative and programmatic challenges. DSS is working on developing and sending out

notices to the approximately 100,000 SNAP recipients classified as ABAWDs regarding the changes to the waiver and the work requirement rules on a compressed one-month time frame. In order to send these notices, DSS needs to translate the notices into 15 languages, program these notices into two computer applications, complete testing to ensure the notices contain the correct information, generate the notices, and finally, print and mail them to the ABAWDs.

13. DSS is working on scheduling and meeting with all individuals identified as ABAWD to explain the rules to them, assess whether those rules still apply to them or whether those individuals are eligible for new exemptions from the requirements, help them determine what employment opportunities would potentially be available to them if they are subject to the work requirements, help them track their hours, and offer a work opportunity to meet the ABAWD requirement. In other words, DSS will need to schedule and meet with approximately 100,000 individuals impacted by the termination of the waiver deadline. DSS is also working on conducting application or re-certification interviews under the new criteria to assess households not currently identified as ABAWD.

14. To meet with approximately 100,000 individuals before November 30, 2025, DSS would need to meet with approximately an additional 6,200 people per day. There are about 52,500 SNAP households, including ABAWD and non ABAWD households, already scheduled for re-certification for the month of November. DSS does not have capacity to meet with that many individuals in November, especially given that there are 16 working days in the month of November. DSS has taken steps to schedule an additional 1,100 people per day before November 30, 2025, and is working to schedule the remaining individuals in December. DSS expects that, inevitably, some of those individuals will not attend the appointment despite the notice, and DSS will need to issue additional appointment notices to reschedule those meetings. Given the

number of people DSS must meet with before November 30, 2025, DSS will likely be unable to reschedule those people. Sixteen days is not sufficient time to schedule and complete these meetings, including for staff, space, and capacity constraints.

15. Additionally, DSS has been and still is working on making changes or updates to its various tracking systems in order to comply with termination of the waiver. For example, adjustments are being made to at least four different software systems for assigning ABAWD status, tracking work requirements and hours, making referrals, and registering and approving volunteer opportunities. However, sixteen working days is not sufficient time to make these technological updates. Additional time – at least four months – is needed to complete these changes.

16. DSS contracted with six not-for-profit vendors across nine contracts in October 2025 to connect DSS clients with assessments, education and training programs, and work opportunities. The capacity of these contracts to handle appointments was based on our historical application and recertification volume. The contracts and service model have been in effect for less than a month and are still in the ramp up phase to full capacity. One month is not sufficient time to schedule an additional 100,000 appointments while also handling the ordinary number of appointments already scheduled. Additional time – at least four months – is needed to reach full capacity and adequately work with ABAWDs.

I declare under penalty that the foregoing is true and correct and of my own personal knowledge. DATED this 27th day of October 2025 at New York, New York.

_____
MOLLY PARK